We have some special visitors this morning to watch oral arguments. They are from the Archbishop Shaw High School. Welcome. We're happy to have you. The first case on our docket this morning is 25-30078, United States v. Talbot. Mr. Chapman. Good morning, may it please the court. Ronald Chapman on behalf of Adrian Dexter Talbot. I have reserved five minutes for rebuttal argument. I intend to address today in this order the court's denial of a competency hearing in July before trial, the Ruan instruction as being insufficient, the other acts evidence, and time permitting the court's determination under 856 that a physician can be convicted under the drug premises statute for this sort of conduct. First, with respect to competency, I believe it's important to start by addressing the standard here. We advocate for an abuse of discretion standard under Flores-Martinez due to the court's denial. While certainly clear error could apply to the prior determinations of the court, here in July before trial, the court readdressed the issue of competency and determined that a competency hearing should not be afforded to Dr. Talbot. Some facts are very important to this analysis. First, back in 2014 and 2015, Dr. Talbot showed signs of progressive decline and worsening, ultimately resulting in him giving up his medical license. He went to a neurologist who later took over his practice and was a co-defendant in the case. That neurologist diagnosed him with dementia. He's 100% service-connected disabled as a result of a Veterans Administration finding, and his dementia likely stemmed from traumatic brain injury he received while he was in the military, in the Navy, as well as his time at Camp Lejeune, North Carolina, where he consumed drinking water that the government has determined was harmful to his health, affording him a 100% service-connected disability. He was interdicted by Louisiana and deemed not competent to handle his own affairs and sat next to me during the entire trial without the ability to remember any of the events in question, without the ability to participate in his defense at all. Despite that, the court determined that he was malingering during initial hearings and determined that his condition hadn't progressively worsened enough to afford a subsequent competency hearing before trial. Recall, trial happened in 2024. His initial symptoms started in 2014 and 2015. Dementia is a condition well known to result in progressively declining conditions, and the court admitted as much when it had a November 2023 competency re-evaluation because of the progressive decline. Despite all that, on the eve of trial, the court determined that regardless of the new finding by a neurologist, Dr. Ranganathan, that sufficient evidence had not been produced by the defense. Respectfully to the court, this was a burden shift. The court required, instead of adhering to its duty that it simply re-evaluate Dr. Talbot when some evidence exists of cognitive decline, a burden shifted to the defense to require proof, additional testing of a cognitive decline, and then it evaluated the case under a standard of worsening as opposed to a new fresh standard of whether at this place in time competency could be established, which is the government's burden. The concern here is if this court determines that that finding was appropriate by the district court, that defendants, after an initial competency determination, would have to show some worsening of their condition instead of re-approaching the competency evaluation anew. A precedent like that would almost surely result in those with conditions such as dementia, which require cognitive decline, to go forward and affirmatively show a worsening condition as opposed to allowing the court simply to re-evaluate competence. A competency hearing wouldn't have taken too long, it wouldn't have been disruptive to the trial, and at the end of the day, the court could have determined that Dr. Talbot received a competency hearing, evaluated him appropriately, and moved forward with trial appropriately. Instead, what the court decided to do was change the standard and say that Dr. Talbot's condition cannot be shown to have worsened. That inverts the finding under 4241, which should have placed the burden on the government once a doubt is raised with respect to competency. The question that the court may ask is whether or not there was a sufficient doubt raised. Well, Dr. Ranganathan's finding, a most recent evaluation done in July of 2024, determined that he was not competent to stand trial. That evaluation was done by a properly licensed neurologist. In addition, additional VA medical documentation showed 100% service-connected disability. In addition, Dr. Nelson, Dr. Talbot's treating physician, also continued to treat him for dementia, and his notes existed in the record to show that he was continually worsening with his dementia condition. The court decided to rely on its own courtroom observations, in part, in deciding that Dr. Talbot didn't require a hearing. Those findings should be rejected by this court, especially when multiple experts evaluated Dr. Talbot and determined that he was not competent to stand trial. That includes Dr. Croft, Dr. Beghali, as well as Dr. Sherman, who didn't do an evaluation, but I would like to address Dr. Sherman's findings as well. One of the main issues raised by defense with respect to competency is that the proper testing was not conducted, that under a Daubert standard, the court failed to properly address whether or not the testing was sufficient. Here, there was a finding that Dr. Talbot was malingering, which is a particularly damaging finding for a defendant, especially one who is a physician, in overcoming. In order to determine that Dr. Talbot was malingering, the court should have looked to the actual testing to determine if malingering existed. Dr. Block and Dr. Sheffetz both, I believe, had findings that Dr. Talbot was malingering. We take issue with those findings because instead of simply offering malingering tests and evaluating those as the medical documentation requires, these PVT tests, Dr. Sheffetz decided to continue to provide malingering tests until he came to the number of failures that he was looking for. Dr. Sherman, who's a co-author of the book that Dr. Sheffetz would have used for these tests, the PVT tests, wrote a letter to the court that was submitted into evidence indicating that Dr. Sheffetz misapplied the evaluation and was therefore not able to determine, or should not have determined, that Dr. Talbot was in fact malingering. Instead of addressing that question, the court backed away from the findings and seemed to indicate in subsequent orders that it wasn't really relying on those malingering tests and that the reality was that Dr. Talbot's condition wasn't sufficient for him to be considered not competent to stand trial. There was overwhelming evidence of incompetence, 100% VA disability, a state interdiction after guardianship findings in state court, MRIs showing neuropsychological decline, and multiple expert findings of incompetence related to a worsening condition. Without any questions, I'd like to... Counsel, can you address the inconsistency between the medical testimony that your client was slumped over, having trouble walking, unsteady on his feet, versus his wife's testimony that he can walk several miles a day, do hundreds of push-ups, be left alone for weeks at a time while she's on a business trip? Yes, thank you, Your Honor. I believe that those findings are somewhat taken out of context. First, Dr. Talbot was notably somebody who kept himself in good health when he was well, but as we all know, dementia is not a condition that puts you in the same state every single day. It's a changed condition, and certainly there are some days where he would have difficulty with engaging in routine activities of daily living, and other days where he was in complete health. Also, those findings weren't made with respect to a specific time period. What we see is that all of this information was lumped together to say sometimes Dr. Talbot was well, and sometimes he was not well, but nobody really said we haven't seen a progressive decline. Instead of looking at that, it would be best for us to look at the malingering tests, which is what would show malingering, and when we look at those tests, we find that Dr. Shafetz had to modify what the appropriate testing is for malingering to come to a malingering determination. So, I guess what I would offer the court is we could look at that anecdotal information, but it would be much better instead to look at the actual malingering tests, and if malingering is determined, find that under a sufficient scientific basis that has been considered reliable and admissible in courts, but thank you for the opportunity to address that. Moving on to the Ruan jury instruction, one of the first issues with the Ruan jury instruction, which is not entirely detailed in the briefs, is that when we combine Ruan, and we combine deliberate ignorance, and we combine aiding and abetting, we end up with a watered-down version of the mens rea standard, which is very difficult for the jury to apply. But even if you just look at the Ruan instruction on its own, at the 841 distribution instruction, as we know, the government was required to prove beyond a reasonable doubt that prescriptions were issued outside the usual course of professional practice for other than a legitimate medical purpose. It appears that the instructions included an additional phrase, though, that prescribing outside the usual course was a sufficient condition for a conviction. It's our contention that a sufficient condition makes prescribing outside the usual course look much more like an objective standard, as opposed to what's required, a subjective standard. This would allow a conviction of Dr. Talbot based on negligence, malpractice, and disagreement. In fact, that's exactly what the prosecution did in this case. The prosecution's brief suggests that Dr. Talbot was running a cash-based pain clinic, a phone mill. In reality, it sidesteps the fact that most of Dr. Talbot's prescribing, and most of the other providers' prescriptions, when they were prescribing, were for addiction treatment. This was an addiction medicine clinic primarily. There was pain also being treated because many patients who suffer from addiction have complex disorders such as pain, along with addiction, and receive medication. Here, the government decided to only offer evidence related to pain management treatment, but then when looking at the totality of the prescriptions, tried to address all prescriptions as if they were under a pain management standard. First and foremost, that's inappropriate, and second, it leads to conviction based on medical disagreements. Now, the primary medical disagreement here is that the government contends that Dr. Talbot was not seeing his patients. In reality, there's no standard that when a nurse practitioner or a PA is evaluating a patient personally, that a physician can't also issue a prescription. That's been allowed by the DEA, federal statutes, and the government produced no information to suggest that a physician must see a patient before issuing a prescription, especially when a mid-level provider is doing the evaluation and treatment. But instead of addressing that fact, the government simply pointed at the fact that Dr. Talbot was issuing prescriptions without seeing patients, and therefore tried to get the jury to determine that those patients were unlawful. In reality, that would be more of a malpractice allegation, not an intentional drug dealing allegation. Instead, what the government should have done is evaluate the care, the medical conditions of each individual patient to determine whether or not those prescriptions would be considered unlawful under 841. Now, with this watered-down standard outside the usual course of professional practice, the government was able to say there's an objective standard that you must see your patients. Dr. Talbot didn't see his patients. Ergo, every prescription would be considered unlawful under this standard. And that's not at all what the Supreme Court said in Moore. That's not at all what the Supreme Court said in Gonzales v. Oregon. Instead, we must look for drug trafficking as conventionally understood. Those are not my words. Those are the words of the Supreme Court. Those are words that were not included in the Ruan decision, but the Ruan decision was for a different purpose. Fundamentally, if Dr. Talbot is to be convicted, he must be convicted as a drug dealer, not somebody who engaged in a practice that was disfavored. And the practice that was disfavored according to the government was that he wasn't there when patients were being seen by mid-levels, but still... Counsel, would you agree that dispensing medications without seeing the patient at least is some evidence or is relevant to the question of drug distribution? Yes, based on the context, Your Honor. Absolutely relevant. If it were the only evidence, maybe, you know, it's irrelevant. I would consider that relevant, and I believe the concurrence in Ruan suggested as much, that a departure from a standard of care may be considered relevant, and we would certainly concede that. But the real issue here is not whether or not he departed from a standard in the community, which the government didn't even show. The analysis really should be whether or not he was trafficking to patients, ergo giving prescriptions to patients who did not need it for a medical purpose. That question is much different in an addiction context, which is what Dr. Talbot was, an addiction medicine provider. That's where the Ruan instruction becomes very difficult. I just have a few seconds left, and I would offer that none of the cases I saw from the government related to 856 stand for the proposition that it suggests that a physician can be convicted under this statute 856 for prescribing medication from a purely textualist approach. It simply doesn't fit. Thank you. Good morning. May it please the Court. Ethan Sachs on behalf of the United States. I'd like to discuss the issues that my co-counsel just spoke with you. So starting with competency, I think it's important to recognize the standard of review for both of these discrete claims that he makes. As to the finding of competency, this Court reviews for a species of clear error, which this Court said in Perkins, which is 99F4-811. And I think under that standard, frankly under any standard, but certainly under that standard, there can be no clear error that the District Court concluded that Mr. Talbot was confident. I'd just like to go through some of the evidence that the District Court relied on to reach that conclusion. The first is that the District Court really relied on the expert testimonies of Schreiber and Denny. We heard a lot this morning in his brief about Dr. Shafetz. That was the original expert, the jointly proposed expert, who reviewed his Dr. Talbot. And in many ways is irrelevant, because in 2023, the District Court conducted what it described as a de novo competency hearing, which Schreiber and Denny testified, and they also concluded that Mr. Talbot was both competent and malingering. Just to give Your Honor some of the evidence. Is there an accepted definition of what malingering means in this context? I'm not sure there is. I kind of know what it means as a general matter, but we keep talking about malingering. Yeah, I don't know if at any point the District Court defined it explicitly, but I think it's just a common-sense, ordinary definition. Faking it? Sorry? Faking it? Well, I don't necessarily mean to be superjorative, but I think... Well, it doesn't sound positive. It's certainly not positive, but I do think it is something close to faking it. Yeah, I don't think the Court ever used that specific words, but I think it's at least embellishing. And as Your Honor's question mentioned earlier, the issue of his wife testifying that he did hundreds of push-ups a day, and then when he went to the medical doctors, appeared hunched over and could barely stand. In addition to that, maybe something else that touches on the flavor of it, is that Manny and Schreiber testified that Mr. Talbot, during the examination, expressed memory loss only as it pertained to this subject matter. As to other things... How old was he at the time? I'm just curious. I believe he was in his 60s. I'm not exactly... I apologize, but I think... I'm not disputing that he's a young person and that someone of his age could have dementia. Oh, I'm glad you think 60 is young. No. Yes, absolutely. I hope to be able to do hundreds of push-ups a day at 60, but... As do I. But I think in addition to the expert's testimony, the district court also reviewed itself, the medical records that were issued in this case, and determined that really this diagnosis of dementia sprung from a self-diagnosis that Dr. Talbot had conducted. And then, as I mentioned before, observed Dr. Talbot's wife testifying at the hearing and found her to lack credibility. That's sort of the first competency issue. The second is this sort of late-breaking request right when trial is starting for yet another competency hearing. And there, as my friend mentioned, the standard is an abuse of discretion. So the district court... This court reviews the district court's decision for an abuse of discretion. The standard is, is there a reasonable cause? And I think it's important to keep in mind that at this point, Dr. Talbot had already been examined by at least eight experts and over a course of years. And the district court, on its own intuition, I think rightfully recognized dementia does have the possibility to be progressive. And so after the 2021 hearing and evaluation, which was really pretty thorough, the district court's own intuition said, in 2023, I'd like another competency hearing, and I think we should do it again. And have them evaluated by other experts and review their testimony. So the idea that the district court has sort of gave short shrift to the expert here is just really not supported by the record. And I just want to mention this idea of interdiction. In Louisiana, what I understand, that is not an adversarial process in which it's tested. That is sort of a process in which a family member, usually a family member, joins someone and gets a determination. It's not the same thing at all. It's not the same standard at all as a court finding someone incompetent in this context. If your honors have no questions about the competency, I'm happy to move on to the jury instructions. I think that the clearest way to resolve this is just to look at page 1266 of the record, which lays out the elements for the substantive, controlled substantive counts here. And see element three, the defendant knew he was acting in an unauthorized manner or intended to act in an unauthorized manner. That is precisely what Ruan requires. It follows this court's pattern during instructions, is undoubtedly a correct representation of the law, and there's no issue with that. What Dr. Talbot appears to be complaining about is the definition of unauthorized, which came earlier in the instructions. And in this language of a sufficient condition to convict, came in describing how one determines, how a juror can determine whether something is unauthorized or authorized. And those really have two prongs. And what that instruction, if you read it, I'm happy to read the whole thing, but I think your honors can see on 1265 that it's really saying either prong is sufficient to establish the unauthorized element. Not that either prong is necessary or affects the mens rea, because the mens rea for counts two through five is explicit on page 1266. And that says the defendant knew he was acting in an unauthorized manner or intended to act in an unauthorized manner. One additional, I think that's enough to resolve that. Just one thing I'd mention is we think this case is even easier because it's that claim should be reviewed for plain error. His brief does say that he objected to it contemporaneously, but I would urge your have any doubt to review the pages of the record that he says qualify as an objection. He certainly objects to the paragraph in which that instruction lies. But what this court said in Ajayi at 64 F fourth at 248 is merely recognizing or pointing out the portion of a jury instruction that one objects to is not sufficient to preserve the argument. You have to raise a specific ground on which you are objecting. And he didn't do that here, neither at the charge conference, which is at 4536 and 4537 or in the original jointly proposed jury instructions to which he lodged several and many objections in the footnotes and not anything about this specific issue or that specific language that he now complains about. What page of the record were you referring to with respect to the jury instruction? So there's two. There's the one, sorry, your honor, the objection. I know that the jury instruction you were talking about earlier. I was just trying to find it. Sure. So 1266. Yeah, is where the district court lays out. It's counts two through five, the elements for the substantive distributing controlled substances offense. And he knew he was acting in an unauthorized manner. I'm sorry, your honor? Instructor says that he knew he was acting. Yes, that's correct. Or intended to act in an unauthorized manner, which is exactly the language that Ruan uses. This is objective component to this crime. If your honors have no further questions about the instructions, I'm happy to touch on the 856 count briefly. Again, I think the simplest way to resolve this is to say what this court has said for, I think, close to five decades now, that a doctor can undoubtedly be convicted of distributing controlled substances. And in fact, it's not just that the court has affirmed convictions of that. It said it specifically rejected this exact argument that Dr. Talbot raises now. I think the clearest place it's done so back in the seventies, it's Harrison 651 F second at 354 note one. It expressly rejects this idea that a doctor can only dispense and not distribute. That's consistent with every court of appeals that we've been able to find to address this issue. Our brief lists them at page 31. It's the sixth circuit, the seventh circuit and the 10th circuit. And many of those cases are quite old at this point. They're from the seventies or from the eighties. And I think that's particularly important here because 856 was enacted in 1986. So not when the original controlled substances back was connected. And at the point that Congress enacted it, those decisions that I just mentioned were already on the books saying a doctor can undoubtedly be convicted of distributing controlled substances. So Congress knew that when it used the word distribute in 856. And if it had any doubt about that, one would think that it would have addressed it or done something about it. Um, I think the clearest way to see this principle is just judge sands, um, federal jury instructions, manual or treatise. And I can just quote from that. It says, as far as practitioners are concerned, the terms dispense and distribute have no functional difference. And then it goes on to say that a petitioner could be charged with either one. We're aware of no court that takes a view that a doctor could not be convicted of distributing controlled substances. Going back to the jury instruction really quickly. Sure. When did the knowingly or intentionally distributed, was that, I thought it said the courts at first, second, third, there was no intentionally piece in that. When did the intentionally piece come in? In other words, if you intend to prescribe a controlled substance and you can do that lawfully, so that doesn't mean that you know, when you say it was, um, knowingly or intentionally distributed. Well, Your Honor, I think it's actually the third element there that I think is the most important and direct on 1266. Yes. Third, that the defendant knew he was acting in an unauthorized manner or, you know, when he dispensed or distributed the controlled substances or intended to act in an unauthorized manner. I think the intent there is specifically in an unauthorized manner. Correct. And so I think that's specifically what Rwan says, that the government needs to prove that a defendant knew or intended to act in an unauthorized manner. And that's tracking the language of the statute. And as Rwan describes, it's basically implementing a subjective requirement into the statute. It's a little ambiguous. I understand the argument. I take your point about dispense and distribute that the cases seem to have treated them, if not interchangeably, as overlapping in a way. Is it true, though, that the statute defines the terms dispense and distribute? It does, Your Honor. Yes, we acknowledge. Is it right to say it defines distribute and to deliver other than by administering or dispensing? It does. Yes. That's confusing. I understand, Your Honor, that Congress probably could have worded that more efficiently, we think, or more clearly. I'm glad you can say that about so many things Congress does. But yes, it's a little confusing. Sure. Yes, Your Honor. But I do think that's why I tried to mention the point about when Congress enacted this. Right. Because they knew that courts were treating doctors as being allowed to distribute or dispense and chose the word distribute, I think, with the understanding that doctors would fall under 856. And it's also odd that they would have two different verbs doing exactly the same thing that runs against the way we normally think about the way Congress writes. Yeah. But I think what Judge Sands' treatise or manual gets to this, I think it's really about distinguishing between sort of the drug dealer and a trap house, if you will, and a practitioner to clarify that really your sort of common day drug dealer can't dispense but can only distribute. And the courts just haven't gone the other way and said, well, a doctor can only dispense and not distribute. A doctor can do both. And I think, frankly, that kind of makes sense in a situation like this in which medics had turned into what we understood to really and what some witnesses testified was a pill mill. At that point, it's not so different than a trap house distributing illicit drugs. And what does the Sands' manual say about the phrase and the definition of dispense pursuant to a lawful order of a practitioner? Yeah. So I think there's some disagreement among the courts about what that exactly means. I mean, we haven't briefed it here, and I don't understand Dr. Talbot to have raised it. But I think there's some question of whether it's the act itself that can be unauthorized or whether it goes to the practitioner's license, whether it's already been called into question. So I think there are cases in which that can be a hard call if someone is a doctor but has some restrictions already on his license. But I don't think that really came into play here at all. But I agree, Your Honor, it's not the perfectly worded statute. We agree. But we think the courts have made the most common sense definition of it possible, or interpretation of it possible. If Your Honors have no further questions, we'd be happy to rest our briefs and ask that you affirm. Thanks very much. Thank you. On the dispense versus distribute point, Mr. Chapman. Yes. Could you respond to the argument that our precedent sort of treats the terms interchangeably? Yes. I think that it can't be said that Congress knew that these terms had been watered down by case law and therefore used them interchangeably in the statute. They're defined in the statute. And according to the entire regulatory scheme of the Controlled Substance Act, they mean separate things. And here's why this is very important. Under the trap house statute, manufacturing, distributing, using drugs can be criminal conduct. And it's evaluated based on whether or not that facility was doing that as a primary purpose. Doctors prescribe, they prescribe prescriptions. Congress would have put distribute into that, I'm sorry, dispense into that statute had they intended for it to be applied to doctors. And then what would have happened is that instead of evaluating a doctor's order, you would have convicted him simply because he issued a prescription for a controlled medication. That's what the government tried to do in this case. They sent a laundry list of prescriptions and said these are unlawful because they are given by this practice and therefore Dr. Talbot should be convicted. Congress doesn't want that. They have 841 for a reason and 841 charges should be evaluated as to whether or not there was a legitimate medical purpose for the prescription. The government can't do an end around by charging 856 and simply moving on with the analysis. That's why these statutes are different. That's why Congress made a difference. And using perhaps some inartful language in circuit and district court cases to suggest that these terms don't mean what Congress intends, I don't think is appropriate in this case. I'd just like to address a few other issues related to competency. First, the government seems to be running away from the Dr. Sheffet's finding and that's fine. But then anywhere we see the term malingering in the record, we should just erase that. The district court determined that Dr. Talbot was malingering. They did that based on Dr. Sheffet's finding. Dr. Sheffet's administered PVT tests and changed the way that he evaluates those from what the literature says, determining that Dr. Talbot was therefore malingering. The court can't say we ignore Sheffet's and then we rely on him in the same breath. As a result, this case should be remanded for a reevaluation of Dr. Talbot. And counsel, is Sheffet's the only doctor who testified that the memory loss seems to be associated primarily, if not exclusively, with this case? I'm glad that the court brought that up. I don't know if that was specific to Sheffet's. So I don't know the answer to that question, unfortunately. But I will say that with respect to the memory loss issue, that was taken out of context. Dr. Talbot was indicted in, I believe, 2022, for conduct that occurred in 2016. He has dementia. He's not remembering things that happened in 2016. But he's remembering his name. He's remembering what he did a few weeks ago. Of course, Dr. Talbot did not remember specifically the criminal conduct alleged because the government indicted this case days before the statute of limitations expired. He had dementia and he was being asked about conduct that occurred as far back as 2014, 15, and 2016. That distinction should not be important to the court. Instead, we look at objective testing and determine whether or not that was sufficient. And in this case, it was certainly not sufficient. While the government didn't address it during oral argument in their briefs, they suggest that Dr. Talbot chose the experts. These were court-appointed experts. These were based on an agreement. Dr. Talbot may agree to a certain expert being used. That doesn't change the standard. And the standard under Daubert and the standard under the competency statute requires that he be fully evaluated and there's a fair hearing. We can't sidestep that. The government indicated that Dr. Talbot had somehow self-diagnosed dementia. That's untrue. Dr. Prasad, who later became Dr. Talbot's co-defendant, evaluated Dr. Talbot as a neurologist. Dr. Talbot went to see him. They had no special relationship. He determined that he had dementia. Dr. Talbot then started taking actions to change the nature of his employment and moved to the VA as a result of those findings. He later gave up his license to practice. He reported his dementia findings to the medical board and he underwent significant medical treatment and evaluation. There's a lot of misunderstandings in the record here and I think that that is, in part, a large misunderstanding that's put forward by the government. There is no question that Dr. Talbot had dementia and was treated for it and was diagnosed by credentialed providers. Thank you.